James H. SEWELL, doing business under the fictitious firm name and style of Burns Cuboid Company, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 14354.

United States Court of Appeals Ninth Circuit.

Oct. 16, 1956.

Maury, Larsen & Hunt, George R. Maury, Los Angeles, Cal., for petitioner.

Earl W. Kintner, Gen. Counsel, Robert B. Dawkins, Asst. Gen. Counsel, Alvin L. Berman, Atty., F. T. C., Washington, D. C., for respondent.

Before POPE, FEE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Sewell, petitioner here, and respondent before the Federal Trade Commission, has successfully built in and from Santa Ana, California, a large business in the manufacture and sale of an article which we can call a shoe insert. Its basic name is Cuboids. This is a derivation from the cuboid bone in the arch of the human foot. Various names are used in marketing like "Cuboid balancer" or "Doggies." A ready market for the device is found among the legion of Americans who complain about their feet.

The insert is ordinarily sold in department stores in metropolitan centers where representatives on the payroll of Sewell sell the product, usually for the account of Sewell, rather than the department store. Those who sell it have had some training in fitting shoes and selling corrective devices. Some sales are made by mail order after a customer has filled out a questionnaire which is intended to elicit his complaints. Some sales are made by stores that do not have a Sewell representative on the premises.

The insert is made on a license from an inventor named Burns, who apparently first marketed the device himself on a limited basis. The article moves in commerce among the states. There are about 200 different models of the same basic thing, which is made with two layers of leather with cork at various points in between the layers of leather. The difference in sizes of shoes accounts for many models. Then for each foot size a variety of thicknesses is manufactured.

The attack initiated by the Federal Trade Commission is on Sewell's advertising. We assume that Sewell would readily admit that his advertising has been a big factor in building his business: that the product has not entirely sold itself.

Some of the lines of Sewell's advertising which were the subject of the Commission's complaint were as follows:

"Cuboids help to balance your body weight * * *

"Cuboid Foot Balancers

" * * * the foot and body balance, the relief from aches and pains Cuboids afford.

"Better poise and balance replace aches and pains.

"Drive away foot fatigue with Cuboids. Enjoy more normal foot action with Cuboids.

"They're the modern way to foot relief—combining scientific principles of balance and support to lessen fatigue and help improve your stance.

"Now everyone can enjoy better posture, poise and balance with * *, Cuboids.

"Especially designed to help you enjoy increased foot health and comfort.

"With Cuboids foot pains often disappear as if by magic.

"Cuboid foot balancers make housework less tiring.

"Cuboids help to distribute body weight removing pressure from delicate nerve centers and arteries transferring it to better cushioned parts of the feet.

"The feet are the body's foundation. Cuboids balance this foundation and provide the basis for correct posture.

"The Cuboid bone is the keystone of the outer or weight-bearing arch and its position determines the relative position of every other bone in the foot. Cuboid metal-free foot balancers are scientifically designed to help bring these bones into normal position.

1. It is evident that Sewell or his predecessors for several years had not proclaimed:
 1. "Cuboids strengthen weak muscles and counteract poor circulation."
 2. "Cuboids aid circulation."
 3. "Cuboids strengthen weak feet."
 4. "Cuboids aid circulation—stimulate flow of nervous energy in the feet."
Some of the critical testimony of the experts concerns these specific claims.

"Cuboids afford effective relief to aching and calloused feet."

After peripatetic hearings in various parts of the United States, the examiner filed a report which proscribed not only the foregoing claims, but which recommended that Sewell be forbidden to use advertising matter which he had discontinued four years previously. The Commission followed the examiner on the advertising set forth above shown to be in current use but refused to whip the dead horse of Sewell's discontinued advertising.[1] Now, Sewell seeks review here.

Before the examiner, medical men, orthopaedic specialists, testified for Sewell's claims and against them. Sewell showed that medical doctors, presumably reputable, in great numbers regularly prescribe his device. He had much testimony that people are regularly pleased with the device. He showed that only three per cent of all purchasers take advantage of their "satisfaction guaranteed or your money back" offer.

But be the foregoing as it may, the Commission entered an order forbidding:

"1. Disseminating or causing to be disseminated by means of the United States mails, or by any means in commerce, as 'commerce' is defined in the Federal Trade Commission Act [15 U.S.C.A. § 41 et seq.], any advertisement which represents directly or by implication:

"(a) That the wearing of respondents' device will assist in balancing the feet or body.

"(b) That respondents' device possesses therapeutic value for aching or painful feet.

Had the examiner eliminated these claims at the outset from consideration of his inquiry, the hearings could have been materially shortened.

Tactically the trial of these more or less specific claims easily permitted the Commission's experts to condemn Sewell's devices more stridently and to overlook the real issue of: Do the supports frequently give relief to those who complain of their feet?

"(c) That the wearing of respondents' device will enable the user to achieve better posture or poise or will improve the stance.

"(d) That the wearing of respondents' device will result in more normal foot action or improved foot action or foot health.

"(e) That the wearing of respondents' device will afford increased comfort for the feet or decrease the fatigue resulting from housework or other physical efforts except to the extent that respondents' device may in instances reduce or relieve the discomfort associated with strained or tired feet.

"(f) That the wearing of respondents' device will have beneficial effect upon the distribution of body weight.

"(g) That the wearing of respondents' device will in any way aid the Cuboid Bone or its position or stability with respect to other bones of the feet or will serve to readjust, realign, normalize or improve the position of the bones of the feet.

"(h) That said device possesses therapeutic value in the treatment of calloused feet.

"2. Disseminating or causing to be disseminated any advertisement by any means for the purpose of inducing or which is likely to induce, directly or indirectly, the purchase of said product in commerce, as 'commerce' is defined in the Federal Trade Commission Act, which advertisement contains any representation prohibited in Paragraph 1 hereof."

This court is satisfied that the Commission must be affirmed insofar as advertising claims assert that the device has a special effect on the cuboid bone of the foot or is a "scientific" device. That is a highly technical matter upon which experts testified both ways. There the Commission could take its choice.

On highly technical matters one's product claims, under the law, are at the mercy of experts, even though the group relied upon may ultimately be proved wrong. Yet that is the way the legal system works and must work.

On the other hand, we are not disposed to issue our mandate to cease and desist with respect to the general claims in the advertising on the assertions made with reference to "balance," "balancers," "improved health," "poise," "improvement of stance," "elimination of foot fatigue," "better posture," and "better foot action." In so holding, we do not believe we vary from the long established principles of reviewing orders such as we have here.

We think that the respondent Sewell by his witnesses demonstrated, simply stated, that people wearing shoes that do not fit their feet, for reasons inherent either in the customer's foot or his shoe, do very, very frequently get a better platform to walk on with the addition of Sewell's insert. Why, we cannot say with certainty. The Commission doctors who roundly condemned the device say there is no reason that the device should relieve one's foot ills. We do not think the doctors' opinion and their few case histories of failures of the device overcome the proof of frequent successful use. There is no proof the device ever did any damage. Some doctors suggested in certain cases it could. Further, we think after cross examination of the Commission's experts very little was left of their opinions on the "lay" claims of general efficacy.

We believe that if we concede that when often the addition of the device produces a better fitting shoe that every one of Sewell's claims naturally flows, except those based on the assertion of special effect on the cuboid bone or the device being scientific. A better fitting shoe should result in better foot balance, some relief from aches and pains, better poise and balance, better poise, posture and balance, better foot health and better comfort. And even housewife's drudgery ought to be lessened.

We think perhaps there are two basic mistakes in the case and which lead us to believe that the Commission was legally wrong in part and justify our declination to enforce the order in full. First, we believe in the testimony of the experts of the Commission, they have failed to start with the premise that Sewell fitter starts with. That is, that the shoe of the customer prospect for some reason does not fit the foot or the foot does not fit the shoe. Maybe a different shoe would often give the customer balance, relief from aches and pains, give him better posture and poise and stance. But if the customer gets it by a Sewell device, we see no objection to advertising that it does. (And in the main, we do not think the expert opinion meets the proof here of the generally satisfied customer.) The Commission experts apparently would proscribe entirely the use of the trial and error method of experimenting with devices to relieve one's foot aches and pains.[2]

Secondly, we think the examiner and the Commission have reduced generality to specificity, when it was not justified. For example, the approach to "balance" seems to have been in the sense of the physicist in the laboratory. We think there is in the vernacular lexicon a meaning for the word which imports a feeling of well being, a feeling "that it fits."

While we must accept the Commission's determination, right or wrong in the abstract, that the claims of special efficacy on the cuboid bone is false science and that it is not a scientific device, we think the other claims of Sewell are within in the legitimate field of "puffing" of the ad man.

In reaching our decision, it should not be understood that we announce our own independent beliefs about Cuboids. It is just our judgment that when the evidence was all in and when the Commission's experts were done that the objections of the complaint as to the general claims about Cuboids were left without substantial evidence, only with general statements of experts weakened too badly by the experts' own subsequent testimony. See Tractor Training Service v. Federal Trade Commission, 9 Cir., 227 F.2d 420.

█ The Commission has not attacked the brand name of "Cuboid." And, of course, it would appear that the name has acquired a secondary meaning. Therefore, our mandate will not affect the continued use of the name "Cuboid," per se.

Sewell claims stoutly that he did not have a fair hearing before the examiner. We find this unnecessary to decide, although a close perusal of the record lends some support to the contention. As one tediously reads the record, a shading in the trial examiner's remarks appears here or a nuance there which gives one a feeling of predestination that the examiner's ruling will be against Sewell. (This occurs independently of the "drift" of the testimony of the witnesses.) Of course, it is difficult to avoid coming to a conclusion before the last question has been asked. Perhaps, the truth may be only that some triers of fact are more circumspect in what they say than others.

But evidence of the foregone conclusion here is found when during the interrogation of the Commission's last expert the trial examiner says, "When he

2. One of the Commission's experts testified that the correct approach to diagnosing foot ailments is to have the sufferer disrobe in the doctor's office, because the trouble may originate above the foot up in the body or the legs. Then the doctor makes a visual inspection of the naked person. Last he looks at the feet. Such a procedure may be the most scientific approach. But we doubt if it is the only approach.

It well may be that the public would be better served if all shoes were fitted by doctors. Perhaps only doctors should prescribe any type of corrective devices, although there is a ring of verity in the testimony of one of Sewell's experts when he says that most medical men, even the bone and joint specialists, do not want to "fool" with foot troubles. But who should prescribe the devices is beyond the scope of this inquiry into Sewell's advertising practices.

[meaning Sewell] appeals––I think if he thinks enough of this [i. e., the point under discussion at the moment], that he will appeal from my ruling and when he goes before the Commission he will have the document he offered to prove by this witness. The Commission will then decide if I am in error in denying him." The examiner's statement is not prefaced by "If I should decide the case against you." And the statement in its context can only be projected on a predetermined conclusion of the issues of the case adverse to Sewell. Else, why would Sewell have any occasion to appeal to the Commission?

If judicial perfection cannot be obtained, at least the observation of the forms of fairness often makes it easier to pull out of the quicksand of error.

On this review, the Commission's order is affirmed insofar as it prohibits Sewell from advertising special efficacy on the cuboid bone and on other related bones, and insofar as he advertises the device is "scientific;" otherwise, not.

JAMES ALGER FEE, Circuit Judge (concurring).

In view of the fact that a dissent is to be filed, the following may add clarity to our determination.

The right of the people who buy shoes and have individual ideas in respect to comfort, poise, balance and posture is involved here. It is not a contest between a selfish seller and an administrative body. Insofar as purely scientific and medical claims are concerned, the Commission is fully supported by this Court. In such a field, where experimentation might be dangerous, perhaps the individual must be protected against himself. It is an extremely close question as to whether a situation existed which justified the elimination of such claims here. However, as to the scientific and medical phases of the findings of the Commission, although these are based upon testimony of experts, this Court has given full concurrence to the results reached.[1] Where almost every individual in the nation passes, perhaps once, perhaps many times a year, through the hands of shoe salesmen, balance, poise, posture and comfort are, in essential, the bases of the sales. In regard to these matters, the individual exercises his own ideas. Even an expert, whether a doctor, a witness for the Commission or a shoe salesman, will be unable to tell the individual that a shoe is or is not comfortable for him or, particularly, her. The idea that each member of the public must be forced to go to a doctor before anyone can help him put anything in or on his shoes circumscribes the liberty of the individual. But this is apparently the attitude of the experts of the agency.

Even after sale, a multitude of wearers of shoes use devices of various sorts to change the balance, poise and posture of the individual or the fit of the shoe to attain comfort. Ankle supports, arch supports, metatarsal pads, rubber sponge, inner soles, corn and bunion pads are added. Shoes are stretched and heels are heightened or raised in part. Outer soles are added. Half soles are placed. Each of these operations may well affect balance, posture and poise of the individual. The wearer ordinarily uses devices for comfort and to give him relief from some real or fancied discomfort. Sometimes any one or more of these devices may be used for style. The low or high heels in women's shoes affect each of these factors. Here the Commission holds that the distributor may not even suggest in advertising that the articles

---

1. Cf. Fulton Co. v. Federal Trade Commission, 9 Cir., 130 F.2d 85, diabetes nostrum; Stanley Laboratories v. Federal Trade Commission, 9 Cir., 138 F.2d 388, douche power; Irwin v. Federal Trade Commission, 8 Cir., 143 F.2d 316, medical device called "detoxifier"; Aronberg v. Federal Trade Commission, 7 Cir., 132 F.2d 165, menstruation remedy; Rhodes Pharmacal Co. v. Federal Trade Commission, 7 Cir., 208 F.2d 382, modified 348 U.S. 940, 75 S.Ct. 361, 99 L.Ed. 736, drug claim of "cure" for rheumatism, arthritis proscribed, but "relief" allowed; Fairyfoot Products Co. v. Federal Trade Commission, 7 Cir., 80 F.2d 684, bunion preparation claimed to give "permanent relief."

which he makes for the specific purpose of affecting balance, poise and posture to advantage may accomplish it to the satisfaction of the wearer.

There was no substantial evidence in the record that cuboids cannot or do not advantageously affect balance, poise, posture and comfort of the wearer and fit of the shoe.[2] There is a great deal of testimony by wearers that some of these elements were affected. There is testimony that these are prescribed by certain physicians. The opinions of the experts, adduced by the agency, contain highly esoteric discussions of the balance of the foot and theories of various schools of scientific thought. The question before the agency was not one for expert opinion. The lay testimony alone was substantial on this issue. Besides, it is obviously true that cuboids, by their mere presence under the foot, must in some way affect balance, poise and posture, and may certainly affect the comfort of the individual, which, of course, is entirely subjective. The addition of an element not previously there can have no other effect. Thus it is not unreasonable to permit the buying public to experiment with devices possessing this characteristic in their search for foot comfort. The question is not one for the exercise of expertise or even for appraisal of expert opinion, but of common sense. As to these features, insofar as the findings were exclusively factual, the standard of review would be the substantial character of evidence adduced to support the determination. However, in this case the finding that these devices do not advantageously affect balance, poise, position and posture could be held "clearly erroneous" under a much stricter standard than we are technically required to apply. Furthermore, for the purpose of review, this Court is permitted to ascertain for itself the issues presented and examine the whole record.[3]

So defined, the final order was not based wholly on a finding of fact, but also upon the proposition of law that the advertising considered in this case violated the statutory criteria and constituted "deceptive acts and practices."[4] This Court would not be required to pass upon the question of whether there was substantial evidence to support any facts upon which the Commission may have made findings. The unsubstantial character of the evidence has been pointed out to show that such findings could not be conclusive and to highlight the fact that the order is founded upon a conclusion of law. A comprehensive review of the decisions indicates that the question whether advertising is "deceptive" is treated in part as one of law. The approach may be somewhat empirical, but the courts do draw the line. In this case, the Commission far exceeded rational bounds in the mandatory order.

Another contention is that the claim of Sewell that "now everyone can enjoy better posture, poise and balance with * * * cuboids" was a universal, unqualified claim and thus patently false. But it cannot be held deceptive because it is addressed to the taste and the subjective feelings of foot and bodily comfort. The advertising was addressed to the general public. Finespun interpretations and pseudo-scientific construction of the language cannot avail the agency, but it must be shown that the effect of the expressions upon the ordinary reader would be to mislead and deceive him.[5]

"What was said was clearly justifiable, under the circumstances, under those cases recognizing that such words as 'easy,' 'perfect,' 'amazing,' 'prime,' 'wonderful,' 'excellent,' are

2. Lippincott Co. v. Federal Trade Commission, 3 Cir., 137 F.2d 490, 491; Carlay Co. v. Federal Trade Commission, 7 Cir., 153 F.2d 493, 496.

3. Federal Trade Commission v. Curtis Co., 260 U.S. 568, 580, 43 S.Ct. 210, 67 L.Ed. 408.

4. Federal Trade Commission Act, as amended, § 5, 15 U.S.C.A. § 45.

5. Folds v. Federal Trade Commission, 7 Cir., 187 F.2d 658; see also P. Lorillard v. Federal Trade Commission, 4 Cir., 186 F.2d 52, 58, where one court affirmed finding that quotation of article out of context was deceptive.

regarded in law as mere puffing or dealer's talk upon which no charge of misrepresentation can be based. [Citing cases.]" Carlay Co. v. Federal Trade Commission, 7 Cir., 153 F.2d 493, 496.

This advertising was not as a matter of law deceptive. It is true, some of it is rather warm in expression.[6] But it is no more expressive than the claims made for the colors and comfort of modern automobiles. If all such claims so expressed were deceptive, practically all modern magazines would cease business.

The courts have exercised the power to overturn decisions of the Commission which were less flagrantly in error than this.

POPE, Circuit Judge.

I dissent. It seems to me clear that the court has assumed a power which it does not have and has meddled in a decision which it is not authorized to make. In Federal Trade Commission v. Algoma Co., 291 U.S. 67, 73, 54 S.Ct. 315, 318, 78 L.Ed. 655, the Supreme Court described what has happened here in language which could not be more apt if it had been spoken concerning this very case. Said the Supreme Court: " 'The findings of the Commission as to facts, if supported by testimony, shall be conclusive.' 15 U.S.C. § 45 (15 U.S.C.A. § 45). The Court of Appeals, though professing adherence to this mandate, honored it, we think, with lip service only. * * * In fact what the court did was to make its own appraisal of the testimony, picking and choosing for itself among uncertain and conflicting inferences. Statute and decision (Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 61, 63, 47 S.Ct. 255, 71 L.Ed. 534) forbid that exercise of power." This is a clear case in which the majority of the court stepping into the shoes of the Commission, have undertaken to say how they would decide it. The clue to their fundamental error is to be found in the last sentence of the opinion's footnote 1 where it is stated that the "real issue" is "Do the supports frequently give relief to those who complain of their feet?" I think it is demonstrable that this was not the issue before the Commission and that it is even less an issue before this court.

In its improper weighing of the evidence before the Commission, the court discloses that it is much impressed with the fact that a substantial number of witnesses testified that they did very frequently get a better platform to walk on with the addition of Sewell's insert. The strong medical testimony which the Commission accepted amounted to a demonstration that if the petitioner's device helped certain individuals it was because it happened to fit their particular foot trouble, but that generally speaking people with foot trouble must be prescribed for individually because of the many varieties of such trouble and the many things which cause them. The court says: "We do not think the doctors' opinion and their few case histories of failures of the device overcome the proof of frequent successful use."

But what the court thus assumes was the issue here and what it expressly said in footnote 1 was the issue, is not the issue at all. Indeed, the order of the

---

6. Compare Gulf Oil Corporation v. Federal Trade Commission, 5 Cir., 150 F.2d 106, where unqualified claims of "complete protection" afforded cattle through use of insecticide were proscribed, (but) unlike the instant case, the merits of insecticide were not a matter of subjective measurement, with International Parts Corporation v. Federal Trade Commission, 7 Cir., 133 F.2d 883, claim that mental finish "prevents" rust does not connote permanency; Kidder Oil Co. v. Federal Trade Commission, 7 Cir., 117 F.2d 892, claims of "perfect" protection for bearings by graphite content oil; Carlay Co. v. Federal Trade Commission, 7 Cir., 153 F.2d 493, claims that reducing plan was "easy"; Ostemoor & Co. v. Federal Trade Commission, 2 Cir., 16 F.2d 962, exaggerated pictorial representation of mattress. Cf. Howe v. Federal Trade Commission, 9 Cir., 148 F.2d 561, certiorari denied 326 U.S. 741, 66 S.Ct. 53, 90 L.Ed. 442, cosmetics held falsely labelled "Hollywood," " 'Favorite of the Stars' ", when actually made in Seattle.

Commission in subdivision 1(e) quoted in the opinion expressly allows as an exception advertisements claiming benefits " 'to the extent that respondents' device may in instances reduce or relieve the discomfort associated with strained or tired feet.' " But as disclosed by the statement of facts in the majority opinion, it is not that kind of claim which is the subject of the Commission's complaint. I refer now to the lists of advertising claims quoted in the opinion. There is no suggestion in any of these advertisements that the benefits claimed "may in instances" occur. There is no suggestion that there is, to use the majority's language, "frequent successful use". On the contrary, the assertions are to the effect that "now everyone can enjoy better posture". The promises are universal and unqualified. Cuboids will help to balance "your" body weight;— they will help "you" enjoy increased foot health and comfort. Everyone, without qualification, is promised better posture, better balance, better health. Those claims were not true.[1] Certainly the Commission was justified by the record here in finding them to be false. In the language of the Supreme Court, the conclusions and findings of an administrative body are to be supported if they have "rational basis" and "warrant in the record", Rochester Tel. Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 764, 83 L.Ed. 1147. By no means can the conclusions of the Commission here be said to be irrational.[2]

This is no different than the case of a Ten Cent store advertising that it had a collection of all kinds of eye glasses suitable to fit every person with impaired eyesight and for the sum of $1.00 any such person could, after trying on these glasses, find a pair which would relieve him of eye strain and impaired vision. Even if hundreds of persons testified that they bought glasses that way and found them very helpful, yet a commission functioning like this one, could properly prohibit that sort of advertising, for it is rational to say that even if many found satisfaction in such glasses, it was nevertheless an unfair or deceptive practice to mislead people into thinking that anyone could safely wear such glasses and that they did not need to consult an expert.

The majority of the court appear much impressed with testimony that many people were pleased with the device. The Commission, more experienced in these matters, must have known, for it is common knowledge, that any charlatan may produce a multitude of testimonials supporting his claims. The issue here is not, as the court says, "Do the supports frequently give relief?", it is, "Whether advertising the device as a cure-all is an unfair or deceptive act or practice?" The rule laid down in the Algoma case, supra, has been cited and applied by the Supreme Court in such a multitude of

1. It is immaterial that any intelligent person would know they must be false. "The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced." Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141.

2. Here the petitioner puts out a stereotyped foot cushion which undoubtedly works fine for many people. It would be fully rational for the Commission to think that any old piece of felt would work as well. The pretensions of the advertising with respect to "balance",

"poise", "posture", "position", the Board could reasonably regard as misleading to prospective purchasers. The court's assumption of superior knowledge that "often" the device makes shoes fit better and that "a better fitting shoe should result in better foot balance, some relief from aches and pains", and that "even housewife's drudgery ought to be lessened," is wholly unwarranted. I think the court is without knowledge as to what percentage of users, if any, would find their shoes better fitting. But even if the court had superior expertise in the fitting of shoes, in aches and pains, and in housewives' drudgery, making findings in this field is none of our business.

cases [3] that I may be permitted to express some astonishment that the majority should, without the citation of a single authority to sustain its action,[4] wholly disregard this settled rule of limitation of this court's authority in cases of this kind.

In American Air Lines, Inc., v. North American Air Lines, Inc., 351 U.S. 79, 76 S.Ct. 600, 603, decided at the last term, the Supreme Court was dealing with § 411 of the Civil Aeronautics Act, 49 U.S.C.A. § 491, which, like the Federal Trade Commission Act, prohibits "unfair or deceptive commercial practices and unfair methods of competition." The court cited and applied its own rules as developed in the Federal Trade Commission decisions. Its language is precisely applicable here. It said, 351 U.S. at page 85, 76 S.Ct. at page 605: "Under § 411 it is the Board that speaks in the public interest. We do not sit to determine independently what is the public interest in matters of this kind, committed as they are to the judgment of the Board. We decide only whether, in determining what is the public interest, the Board has stayed within its jurisdiction and applied criteria appropriate to that determination." With that standard for determining the function and jurisdiction of this court, this decision cannot stand.

The concurring opinion, instead of adding "clarity to our determination", seems to me to travel even more wide of the mark. From some source outside the record we are furnished information about how some people use ankle supports, arch supports, metatarsal pads, and a variety of other named inserts; how others stretch shoes, heighten heels, add soles and half soles, and that "each of these operations may well affect balance"; some "may be used for style", and high or low heels in women's shoes "affect each of these factors". (i. e., I suppose, both balance and style). Although disclaiming any such "expertise" as to permit me to affirm the assertions of my associates in this field, I do not question the existence of the named practices. Indeed, I have even heard of people wearing copper plates in their shoes to ward off arthritis.

Listing all these practices which shoe wearers may try for themselves might furnish a plausible reason why the Commission should not concern itself with as small a matter as cuboids, on the theory that if the public do not try cuboids, they will probably try something else.

But those are considerations not within our competence. The Commission has found the methods of advertising unfair and deceptive, and petitioner's claims that "every one" will be helped by this cure-for-all are false. The finding has a rational basis and warrant in the record. It is not for us "to determine independently what is in the public interest."

---

3. "In a matter left specifically by Congress to the determination of an administrative body * * * the function of review placed upon the courts * * is fully performed when they determine that there has been a fair hearing * * * and an application of the statute in a just and reasoned manner." Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 332, 86 L.Ed. 301.

4. The only case cited in the opinion is Tractor Training Service v. Federal Trade Commission, 9 Cir., 227 F.2d 420. The only resemblance that case has to the present one is that it was a Federal Trade Commission case. The court there sustained the Commission.